THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MELVIN JACKSON, Defendant-Appellant.

Third District   No. 3—85—0521

Opinion filed July 24, 1986.

Robert Agostinelli and Kenneth D. Brown, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward Petka, State's Attorney, of Joliet (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE BARRY delivered the opinion of the court:

Defendant, Melvin Jackson, was found guilty of the burglary of an automobile after a jury trial in the circuit court of Will County. Conviction was entered and he was sentenced to a five-year term of imprisonment. In this appeal, defendant takes issue with the trial court's denial of his pretrial motion to suppress, its denial of his motion for a mistrial for possible tainting of the jury, and its denial of his motion for a new trial on grounds of prosecutorial misconduct. We affirm.

Defendant was arrested in the afternoon of February 6, 1985, in the parking lot of a Bolingbrook shopping center. He was subsequently charged, together with Ricky Cotton and Donald King, with having entered a black 1978 Trans Am belonging to Susan Field with the intent to commit a theft. The circumstances leading up to defendant's arrest, as presented at the hearing on his motion to suppress, follow.

Dennis Wheeler, a freshman student in a law-enforcement program, was riding on patrol with police officer John Moravecek of the Bolingbrook police department as part of his internship on February 6, 1986. At the suppression hearing, Wheeler testified that he and Moravecek monitored three radio dispatches between 1:45 and 2:10 p.m. concerning the theft of a vehicle from the Hillcrest Shopping Center around 1:30 that afternoon. According to the broadcast messages, the theft had been committed by three black males driving a blue van, possibly a Dodge, with blue recreational license plates. The officers were also cautioned that one of the men may have been carrying a 4-inch steel-plated revolver. The blue van was reported as having been last seen traveling northbound from mile post 264 around 1:50 p.m., on I-55.

After hearing the third dispatch around 2:10 p.m., Moravecek was north of mile post 264, and he parked his squad car on the northbound entrance ramp at Interstate 55 at the intersection of Route 53 and I-55, having stopped a vehicle for no license plates. Wheeler remained in the squad car while Moravecek walked over to issue a citation. Wheeler next saw Moravecek pointing and gesturing to him to look at a blue van on the northbound exit ramp at a stop light directly

across from where the squad car was parked. Wheeler saw two black males seated in the front of the van looking back at the squad car, which still had its mars lights flashing. As he watched, the passenger slouched down in his seat. When the light changed, the van crossed three or four lanes of traffic without signaling and proceeded north on Route 53.

Moravecek returned to the squad car and backed down the ramp to follow the van. The mars lights remained on, but Moravecek did not activate his siren. Enroute, Moravecek radioed to the dispatcher that he believed he had the blue van involved in the Hillcrest theft in sight. The van pulled into the Bolingbrook shopping-mall parking lot and parked. As Moravecek and Wheeler pulled into the lot, another squad car pulled up to assist. Moravecek parked up behind the van and Officer Gunthy, in the second squad car, pulled up along the driver's side of the van. Both officers approached the van with guns drawn.

The driver (defendant) got out of the van. He was placed against the van, and the two officers proceeded to frisk him as Wheeler overheard another radio dispatch. This dispatch provided further information about the van's driver, describing him to be about 5 feet 11 inches tall, weighing about 150 pounds, and wearing green coveralls and a black stocking cap. A search of the defendant yielded a pair of 8-inch silver-colored modified vice grips. No gun was found. Wheeler testified that he thought the radio broadcast physical description of the driver was close to that of the defendant, although he said that the defendant was wearing blue coveralls. The passenger also stepped out of the van. He was not wearing green coveralls. Wheeler stated that a green army jacket and a black knit cap were subsequently found in the van. A screwdriver, empty beer cans and a bottle of alcohol were also found. Wheeler noted that the van had cardboard over the grille. Moravecek inquired via radio whether the van involved in the auto theft had had cardboard over the grille, and a response was returned that it had.

At the scene of the arrest, defendant identified himself as Terry Jackson. He had neither a driver's license nor any identification. A registration check on the van was returned inconclusive. Defendant was subsequently taken to the police station for booking, and the van was towed.

Defendant testified that he had used several aliases, but that his correct name is Melvin Jackson. He stated that he had taken his girlfriend's van as a practical joke on February 6, 1985. He and a friend, Ricky Cotton, had headed south on I-55 and he observed Moravecek's

squad car with the flashing mars lights at the intersection of I-55 and Route 53. Defendant denied breaking any traffic laws or drinking in the van. He denied having had a second passenger in the van earlier on the day of his arrest. Defendant said he pulled into the mall parking lot to do some shopping for his son. When he parked, he heard the police yell at him and Cotton to get out with their hands up. No arrest warrants and no search warrants were produced.

No other witnesses testified at the suppression hearing. At the close of the defendant's evidence, the prosecution moved for a "directed" finding that at the time of defendant's arrest the officers had probable cause to believe that the defendant had committed an auto theft. After arguments of counsel, the trial court granted the prosecutor's motion and denied defendant's motion to suppress all evidence and statements as fruit of the poisonous tree.

■■ Clearly a warrantless arrest is not valid unless supported by probable cause. Where, however, the totality of the facts and circumstances known to the officers at the time of an initial detention are not such that a reasonably prudent person would believe that the subject is committing or has committed a crime, but would nonetheless support such a reasonable inference, the detention, if temporary and relatively nonintrusive, may be justified, allowing for the officer to discover sufficient facts to support a subsequent arrest. *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; Ill. Rev. Stat. 1985, ch. 38, par. 107—14.

Here, as is so often the case when a vehicle is involved, questions are raised as to whether the initial detention was a valid *Terry* stop or was based on a mere hunch, and when did the situation escalate to an arrest—at the time defendant stepped out of the van in response to the arresting officers' command, as suggested by defendant; or after Moravecek's pat-down search and his discovery of the modified vice grips in defendant's pocket, as contended by the prosecution.

■■ The trial court found that Moravecek had probable cause to arrest "based upon the radio broadcast and that there's no *prima facie* case to the contrary." On review, we need not accept the trial court's reasons for ruling as it did, but we must determine only whether the trial court's decision to deny the defendant's motion to suppress is contrary to the manifest weight of the evidence. (*People v. Dyer* (1986), 141 Ill. App. 3d 326, 332, 490 N.E.2d 237, 241, citing *People v. Tobe* (1971), 49 Ill. 2d 538, 547, 276 N.E.2d 294, 300.) Factors to be considered in determining whether a detention is an investigatory stop or an arrest include:

"the demeanor of the police officer, display of a weapon by an

officer, physical touching of the person, and the use of language or tone of voice. Other considerations include whether defendant is handcuffed or placed in a squad car [and] the duration of detention." *People v. Dyer* (1986), 141 Ill. App. 3d 326, 332, 490 N.E.2d 237, 242.

From the radio dispatch, Moravecek knew that he was looking for a blue van, possibly a Dodge, with blue plates and male, black occupants. The van was last seen heading north on I-55 from mile post 264. In addition, Moravecek's first sighting of the van coincided in time, distance and direction with the information from the radio messages. The officer knew that two black males were seated in the front. The van matched the description of the van described in the messages, even though it was subsequently determined to be a Ford, rather than a Dodge. Wheeler's testimony further established that the passenger, Rick Cotton, slouched in his seat as Wheeler looked at him from the parked squad car. This furtive movement, coupled with a near match with the descriptions of the van, its occupants, and the physical and temporal proximity of the sighting north of mile post 264 gave the officer a sufficient framework of facts and circumstances to warrant a reasonable inference that the van's occupants may have committed the auto theft at the Hillcrest Mall.

We are not disturbed by the fact that Moravecek had observed two, rather than three, individuals in the van since it would be entirely reasonable to assume that there would not be room for a third person also to sit in the front passenger seat. Nor are we disturbed by the fact that the van was in fact a Ford, instead of a Dodge. As explained at the suppression hearing, the two makes are very similar in design.

Concededly, the facts before us present a very close case for determining whether the defendant was arrested prior to Officer Moravecek's discovery of the silver-colored vice grips. The most persuasive factor suggesting an arrest, instead of an investigatory stop upon defendant's descent from the van, is that the officers approached the van with their weapons drawn. This factor has been held, however, not to have converted an otherwise valid *Terry* stop into an arrest where the arresting officer has information that the suspect may be armed with a gun. (See *People v. Gunderson* (1978), 66 Ill. App. 3d 516, 383 N.E.2d 1296.) Here, as in *Gunderson*, in addition to having substantial facts to justify a reasonable suspicion that the van and its occupants may have been involved in the commission of a crime, the officers had reason to believe that the defendant may have been armed. As aforesaid, the arresting officers had sufficient

facts to make a *Terry* stop for investigative purposes when they arrived at the Bolingbrook mall parking lot.

The officers' commanding tone of voice in ordering defendant and Cotton to exit the van and their approach with weapons in hand, under these circumstances, are justified even though the officers lacked sufficient facts at the time to support an arrest based on probable cause. Similarly, the pat-down search which resulted in discovery of the modified vice grips was justified under *Terry* and its progeny because of the officers' need to protect themselves.

During the pat-down search, another radio dispatch was received describing the driver as tall and thin, wearing green coveralls and a black stocking cap. This information was generally corroborated. According to Wheeler, the defendant wore a "lumberjack" knit cap and blue coveralls. Under all of the circumstances presented, we believe it unimportant that Wheeler perceived defendant's coveralls to be blue, instead of green, since it is entirely likely that they were neither emerald green nor royal blue, but some greenish-blue or bluish-green shade in between. Similarly, we have no qualms about the discrepant descriptions of the defendant's cap—whether it was perceived as a dark stocking cap or a lumberjack knit cap amounts to an insignificant variance. Obviously, the hat was neither a Yarmulke nor a bowler hat, but a small, dark, knit variety of millinery somewhere between the two.

Finally, the discovery of the modified, silver-colored vice grips—a tool usable for entering locked vehicles—in the defendant's pants pocket provided the necessary fact which gave the officers probable cause to arrest. It was at this point that Moravecek handcuffed defendant and placed him in the squad car. We find that defendant was arrested at this point. Further, a search of the van after defendant was cuffed was a valid search incident to a legal arrest. Accordingly, we hold that the trial court committed no error in denying defendant's motion to suppress at the conclusion of the evidence presented by him at the suppression hearing.

Next we address defendant's issues challenging the fairness of his trial.

Any errors that may have been committed during the prosecutor's closing arguments have been waived for failure to object at trial. The specific instances of misconduct as alleged on appeal were not brought to the attention of the trial court either by objection during trial or in defendant's post-trial motion. Also we find they were not so egregious as to require our review under the doctrine of plain error.

During the jury's deliberations and before they returned with a verdict, defense counsel learned that during the course of the trial the jurors had been sent to a room designated for the grand jury. The blackboard in that room, it was disclosed, displayed the following words: "You have the right to call the accused." On motion of defendant, the trial court permitted counsel to examine the jurors about this matter after they returned to the courtroom with their verdict. By a show of hands, all of the jurors indicted that they had seen the words on the blackboard. The prosecutor then asked for a show of hands in response to his inquiry as to whether anyone's verdict was affected by seeing the words on the blackboard. None of the jurors raised a hand. The jury was discharged. Defendant contends that the message on the blackboard constituted an impermissible comment on his fifth and fourteenth amendment rights not to testify and that he is, therefore, entitled to a new trial.

Not every infringement of the defendant's constitutional rights during a trial will be considered reversible error. As has been oft stated, the defendant is entitled to a fair trial, not a perfect one. While we are unaware of any reported cases involving the precise type of jury contamination posed by the facts before us, our review of the applicable principles of law lead us to conclude that the trial court did not abuse its discretion here in denying defendant's motion for a new trial.

The evidence of defendant's guilt of the offense charged as proved by the prosecution at trial was overwhelming. Moreover, whether prosecutorial comment or reference to a defendant's failure to testify is reversible error is tested by "whether 'the reference [was] intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify.' " (*People v. Mills* (1968), 40 Ill. 2d 4, 8, 237 N.E.2d 697, 700.) The facts before us fall far short of any intentional or calculated conduct. It is readily apparent that the message was placed on the board for the use of grand jurors and, through inadvertence, had not been erased before the jury in this case was directed to wait in the room.

Further, the contamination here must be considered at most an indirect comment on the right to testify. The words displayed on the backboard did not purport to be directed to the jurors. Nor did they purport to refer to the defendant. If the words were construed by the jurors to mean that they, or the prosecution or defense counsel had the right to demand that the defendant testify, as contended by defendant on appeal, then that inference should have been overcome by the giving of Illinois Pattern Jury Instruction, Criminal No. 2.04

(2d ed. 1981). It is certainly unfortunate that this jury was exposed to the statement, but was do not find prejudice. In so stating, we do not consider the jurors' failure to raise their hands in response to the prosecutor's inquiry as probative of actual prejudice. Such inquiry was a direct attempt to probe the jurors' mental processes or deliberations and was improper (*People v. Holmes* (1978), 69 Ill. 2d 507, 372 N.E.2d 656), but harmless here.

We hold that where the contamination complained of is an indirect reference to the defendant's failure to testify, which was not calculated or intended to direct the jury's attention to defendant's silence at trial, and no actual prejudice has been shown, we will not reverse the judgment of the trial court unless an abuse of discretion is manifest. Based on our review of the record before us on appeal, we do not find that the trial court abused its discretion in denying defendant's motion for a new trial.

For the reasons stated, we affirm the judgment of the circuit court of Will County.

Affirmed.

SCOTT, P.J., and HEIPLE, J., concur.