THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARTIN RUNNION *et al.*, Defendants-Appellants.

Second District Nos. 2—86—0007, 2—86—0008, 2—86—0332 cons.

Opinion filed December 23, 1986.

Robert W. Smith, of Hillside, for appellants.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Dale M. Wood, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE NASH delivered the opinion of the court:

The defendants, Martin Runnion and Alan Wallschlaeger, appeal from the judgment of the circuit court of Du Page County entered on November 15, 1985, convicting each defendant of two counts of burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—1(a)), and sentencing each of them to two years' probation. Defendant Wallschlaeger also appeals from his conviction on February 20, 1986, for four additional burglaries (Ill. Rev. Stat. 1985, ch. 38, par. 19—1(a)). Wallschlaeger was sentenced to four terms of two years' probation, each to be served concurrently with the terms entered in connection with the judgment of November 15, 1985. The defendants contend on appeal that the trial court erred in denying their motion to suppress evidence and statements obtained after a police officer stopped the car in which the defendants were traveling.

At the hearing on the motion to suppress, Glen Treckler, a police officer for the village of Downers Grove, testified that on April 11, 1985, at 3:30 a.m., he was in a police car patrolling near a large building which housed various stores and offices; there were no residences in the area. From his experiences as a patrol officer, Treckler knew that the last business in the area closed at 1 a.m. and the employees were generally gone by 1:30 a.m. The parking lot by that building was accessible by a frontage road. Officer Treckler testified that he checked the parking lot near a business called Unique Mailing and noticed that the business was closed and that the parking lot was empty. Ten minutes later he saw a vehicle, with the defendants in it, pull out from the parking lot. Treckler stated that he knew many of the employees, although he did not know each one of them. Patrons of the last business to close in the area generally parked in another section of the parking lot than the area where he first sighted the defendants.

Treckler testified further that the defendants were in an area that was known to be a high crime area. On the weekend before the incident at issue, there had been 50 arrests, many of them related or involving disorderly conduct, which had taken place in the parking lot where he saw the defendants. Treckler also indicated that there had been burglaries to businesses and to vehicles in the surrounding busi-

ness parking lots. He agreed that he did not witness the defendants commit any traffic violations and did not know that any crime had been committed in the area when he stopped the defendants.

Officer Treckler stated that he found the circumstances suspicious, and he activated the red lights and spotlight on his car to stop the defendants. Defendant Runnion exited the vehicle and walked around toward the officer. Treckler asked Runnion what he was doing in the area, and Runnion told Treckler that he and Wallschlaeger were just out for a drive. Treckler testified that Runnion could have left, but he planned to detain Runnion for a few more seconds until he found out what was going on. The police officer noted that Runnion was shaking as he looked into the defendants' vehicle. Defendant Runnion had left his door open, and the light inside the car illuminated the interior. Treckler saw defendant Wallschlaeger reaching underneath the seat and opening and closing the glove compartment. Wallschlaeger was also bending forward. These actions made Officer Treckler apprehensive, and he walked toward the front of the car.

Treckler asked Runnion for permission to look inside, and Runnion consented. For safety purposes, Treckler requested that Wallschlaeger exit the vehicle, and Wallschlaeger did so. When Treckler reached underneath the seat where Wallschlaeger had been making movements, he retrieved a radar detector. Runnion stated that he had never seen the detector before. Treckler then walked over to the driver's side of the vehicle and shined his flashlight down between the two front seats of the car, where he saw a hammer that appeared to have scratches on it and glass fragments on the head.

Treckler continued his search by reaching underneath the driver's seat and retrieving a second radar detector. Another officer, Scalzetti, had arrived on the scene, and he agreed to check the immediate area for cars which might have been burglarized. Scalzetti was gone for 5 to 10 minutes, during which time Treckler and another officer remained at the scene of the stop. Treckler advised the defendants of their *Miranda* rights and asked Runnion about the detectors; Runnion again denied knowledge of them. Treckler testified that he would probably have let Runnion leave if Runnion had "pushed the issue," but he did not tell the defendants that they were free to go. Officer Treckler also agreed that he could possibly have taken down information regarding the defendants and their vehicle and then let them go until he found out whether a crime had been committed.

Officer Scalzetti radioed to tell the officers with defendants that he had located a vehicle with a broken window in an adjoining parking lot 200 or 300 feet from the place where Treckler had stopped the

defendants. Scalzetti returned to the scene and told the other officers that it looked like a radar detector had been removed from the car with the broken window, and Treckler then placed the two defendants under arrest. Defendant Wallschlaeger subsequently gave oral and written statements regarding the burglary of a motor vehicle.

■ The defendants contend that the initial stop was not reasonable because there were no facts upon which the officer might reasonably have believed that criminality was afoot. In order to justify stopping an automobile and detaining its occupants, a police officer must point to specific, articulable facts which, taken together with rational inferences from those facts, reasonably warranted the stop. (*Terry v. Ohio* (1968), 392 U.S. 1, 20-21, 20 L. Ed. 2d 889, 905-06, 88 S. Ct. 1868, 1879-80.) In Illinois, the standard has been codified in the Code of Criminal Procedure of 1963. Section 107—14 provides:

> "A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102—15 of this Code, and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped." (Ill. Rev. Stat. 1985, ch. 38, par. 107—14.)

This standard applies with equal force to the stop of a motorist. *People v. Lang* (1978), 66 Ill. App. 3d 920, 923, 383 N.E.2d 782, 784.

In a case involving similar facts, a stop was upheld as reasonable. (*People v. Jackiewicz* (1981), 96 Ill. App. 3d 222, 224, 421 N.E.2d 385, 387.) In that case, the police officer saw the defendant pull out from behind an automotive business. The police officer knew that the car was using the only access road to the business, that the business and other automobile dealers had been experiencing thefts and vandalism, and that the business was not open at that time. As the police officer followed the car, he noticed the passenger in the front seat making movements as if he was putting something on the back floor of the car, and the passenger appeared jittery.

■ We consider under the facts shown here that the police officer had a reasonable suspicion criminal activity was, or had been, taking place, and he could properly stop defendants. (See *People v. Ellis* (1983), 113 Ill. App. 3d 314, 318, 446 N.E.2d 1282, 1285.) We do not agree with defendant's argument that the facts here are like those in *People v. Deppert* (1980), 83 Ill. App. 3d 375, 382, 403 N.E.2d 1279,

1283, where the court held that the police officer improperly stopped the defendant's car. In that case, the officer testified that he had no reason to believe that the defendant had committed a traffic violation or any other crime. He only saw the defendant traveling slowly and turning around in a parking lot in an area of town where the officers said many things occurred, including the dumping of bodies. The police officer saw nothing to suggest that the defendant did anything in the railroad lot where he turned around, and the officer testified that he did not think that the defendant even had time to get out of his car. There, the defendant's actions were consistent with lawful activities, and the area was not plagued by a high crime rate. The officer stated that he stopped the defendant's car to see if the defendant needed assistance and because he was suspicious. In contract to those facts, here the police officer testified that the sole reasons that he stopped the defendants' car was that he was suspicious of the defendants in that they were in an area having a high crime rate shortly after the officer had patrolled the parking lot, thereby giving the defendants time to have engaged in criminal activity before fleeing in the vehicle. In these circumstances, we conclude the police officer acted reasonably in stopping the defendants.

■ Next, the defendants contend that even if the police officer could properly have executed the stop, the permissible scope of the investigatory stop was exceeded. In determining at what point an investigatory stop becomes a custodial detention requiring probable cause, the question is whether a reasonable person would have believed that he was free to leave the scene. The relevant circumstances include whether there was the threatening presence of several officers, whether there was a display of a weapon by any officer, whether there was physical touching of a person or use of language or a tone indicating that compliance with an officer's request might be compelled, and whether an accused voluntarily initiated the exchange with the police officers or remained in their presence and assisted with the investigation. *People v. Cart* (1981), 102 Ill. App. 3d 173, 184, 429 N.E.2d 553, 562, *cert. denied* (1982), 459 U.S. 942, 74 L. Ed. 2d 199, 103 S. Ct. 255.

The defendants argue that since they were stopped by a uniformed police officer, the officer asked defendant Wallschlaeger to exit the vehicle, and Officer Treckler searched the defendants' car, the circumstances were such that a reasonable man would have believed that he was under arrest. The defendants point out that they were detained for 5 or 10 minutes while Officer Scalzetti drove around the area looking for burglarized cars and during that time, Of-

ficer Treckler read the defendants their *Miranda* warnings. The defendants note Officer Treckler's testimony that if defendant Runnion had pushed the issue, Treckler possibly would have let him go. Defendants argue that this testimony is indicative of an atmosphere in which defendants reasonably would not have believed they were free to leave the scene. Because the police officer did not know at that time that a crime had been committed, defendants assert that they were arrested without probable cause.

None of the investigatory techniques such as interrogation of persons detained, communication with others, detention of a subject while a determination is made whether an offense actually occurred in the area, or the viewing of a subject by witnesses to a crime is inherently objectionable, although doubt may be cast upon the reasonableness of the detention if the use of such techniques unduly prolongs the detention or involves moving the suspect to another locale. (*People v. Vena* (1984), 122 Ill. App. 3d 154, 162, 460 N.E.2d 886, 892, *appeal denied* (1984), 101 Ill. 2d 576.) The fact that Officer Treckler may have had doubts about whether he would have allowed the defendants to leave if they had sought to do so does not necessarily mean that a reasonable person would not have felt that he was free to leave the scene. (See *People v. Cart* (1981), 102 Ill. App. 3d 173, 184, 429 N.E.2d 553, 562, *cert. denied* (1982), 459 U.S. 942, 74 L. Ed. 2d 199, 102 S. Ct. 255.) Brevity of an investigatory detention is an important factor in determining whether a detention is unreasonable, but courts must also look to the purposes served by the stop as well as the time reasonably needed to effectuate those purposes. It is appropriate to consider whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. If the results of the initial stop dispel questions in an officer's mind, the stop may go no further, and the individual should no longer be detained, but if an officer's suspicions are confirmed or further aroused, the stop may be prolonged and the scope enlarged as required. *People v. Hardy* (1986), 142 Ill. App. 3d 108, 115, 491 N.E.2d 493, 498.

Here, we conclude that Officer Treckler properly stopped the defendants. After the stop, Treckler saw the defendant Wallschlaeger making furtive movements, and, in response to a legitimate fear for his own safety, Treckler requested Wallschlaeger to exit the car. Such an incremental intrusion was not unreasonable. (*People v. Sturlic* (1985), 130 Ill. App. 3d 120, 125, 474 N.E.2d 1, 5.) At that point, defendant Runnion consented to a search of the car, and Officer Treckler saw a hammer with glass fragments on its head and a radar

detector underneath the car seat, which defendant Runnion volunteered that he had never seen before. Officer Treckler then retrieved a second radar detector from underneath another seat. At that point, Officer Treckler's suspicions had been further aroused, and the detention was properly prolonged for the 5- or 10-minute period during which Officer Scalzetti searched the nearby area for any vehicles which appeared to have been burglarized.

 We consider that the officers diligently pursued their investigation using reasonable means, limiting the investigation to a nearby area while they detained the defendants for a limited period of time. Based on these facts, we do not find that the officers exceeded the permissible scope of an investigatory stop thereby converting the stop into a custodial detention and conclude defendants' motion to suppress was correctly denied.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

DUNN and REINHARD, JJ., concur.